```
1                     UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF ARKANSAS
2
                    Case No. 4:19-CR-00514-DPM-1 and -2
3
UNITED STATES OF AMERICA,      )
4                              )
      GOVERNMENT,              )
5                              )
      -v-                      )
6                              )
DONALD BILL SMITH AND SAMUEL )
7 SHERMAN,                     )
                               )
8     DEFENDANTS.              )   Little Rock, Arkansas
                               )   September 10, 2021, 9:29 A.M.
9 _____)

10

11           TRANSCRIPT OF DAUBERT HEARING PROCEEDINGS

12           BEFORE THE HONORABLE D.P. MARSHALL, JR.

13                 UNITED STATES DISTRICT JUDGE

14

15 Appearances:

16 (On Page 2.)

17

18     Proceedings reported by machine stenography; transcript
prepared utilizing computer-aided transcription.
19

20

21

22

23

24

25
```

Stephen W. Franklin, RMR, CRR, CPE
United States Court Reporter
stephen_franklin@ared.uscourts.gov (501)604-5145

```
 1    Appearances:

 2    FOR THE GOVERNMENT          Anne E. Gardner, ESQ., AUSA, and
                                 Bart Dickinson, ESQ, AUSA
 3                               U.S. Attorney's Office
                                 Eastern District of Arkansas
 4                               Post Office Box 1229
                                 Little Rock, AR 72203
 5
      FOR DEFENDANT SMITH         J. Blake Hendrix, ESQ., and
 6                               Margaret Diane Depper, ESQ.
                                 Fuqua Campbell PA
 7                               Riviera Tower
                                 3700 Cantrell Road, Suite 205
 8                               Little Rock, AR 72202

 9    FOR DEFENDANT SHERMAN       George B. Morledge, ESQ.
                                 Morledge Law Firm
10                               300 Spring Street, Suite 615
                                 Little Rock, AR 72201
11
                                 *  *  *  *  *
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1            (Call to the order of the Court.)

 2            THE COURT:  Good morning, everyone.  Y'all can be

 3    seated or stand as you choose.  Good to see you.

 4            Counsel, any preliminary matters on your mind that

 5    you want to raise?  Mr. Hendrix?

 6            MR. HENDRIX:  No, Your Honor.

 7            THE COURT:  Mr. Morledge, I started to look at

 8    Mr. Rosenzweig, but he's otherwise occupied today.

 9            MR. MORLEDGE:  He is.  He's probably asleep at the

10    moment, if you know what I mean.  But, no, Your Honor, we have

11    nothing for Mr. Sherman.

12            THE COURT:  Good.  Thank you.

13            Ms. Gardner?

14            MS. GARDNER:  No.  Thank you, Your Honor.

15            THE COURT:  Counsel, I appreciate y'all raising with

16    the Court this refreshing recollection issue yesterday.  I had

17    my law clerk hand out a lovely case from Maryland that I found

18    that's just a pleasure to read that gives a good summary of

19    the law; and the short story is, Mr. Hendrix, you were exactly

20    right, that anything can be used to refresh a witness'

21    recollection, and I think I was tangled up on recorded

22    recollection and the use of things that the witness had

23    written down before.  Slightly different matters.

24            Two other cases that you might want to look at if

25    this is an item of interest to you, Parliament Insurance,
```

1   that's 676 F.2d 1069.  It's a Fifth Circuit case.  And

2   Marrero, M-a-r-r-e-r-o, 651 F.3d 453.  That's the Sixth

3   Circuit case.  Parliament is a Fifth Circuit case.

4          Other loose end.  Ms. Gardner, you were right and I

5   was wrong on the redaction issues.  I agree with you that --

6   or with the United States and what you indicated the law was

7   earlier.  No redaction needed, as you're covering with the

8   witnesses what they said before.  I would ask that if a

9   witness begins to crawfish, and you are having to prod them,

10  that we be careful and steer away from words that might

11  implicate the co-defendant.  So . . .

12         MS. GARDNER:  So having said that there's no

13  redaction, could you kinda give me -- explain a little better

14  what you expect me to elicit from the witness?

15         THE COURT:  Whatever they said before.

16         MS. GARDNER:  Okay.  Okay.  That's fine.

17         THE COURT:  And -- but if they don't remember when

18  you're doing it orally, just don't put undue emphasis on the

19  co-defendant slices.

20         MS. GARDNER:  Sure.  I got you, yeah.

21         THE COURT:  Good.  Thank you.  All right.  Good.

22         I'm looking forward to our Daubert hearing today,

23  and I appreciate the parties' filings, which I have reviewed

24  again, and how -- Ms. Gardner, how would you propose to

25  proceed?

1              MS. GARDNER:  I have Mr. Sedwick here this morning.

2    He is prepared to testify in a Daubert sense about, it's

3    called NELOS data, I found out, NELOS, and he is also prepared

4    to testify a little bit about why in this particular case it

5    is reliable in comparison to other cases where it may not have

6    been used.  We do not intend to go through his trial testimony

7    today, Your Honor.

8              THE COURT:  That was my hope.  I don't think I need

9    the trial testimony, and I appreciate you focusing in on

10   things.

11             Did you wish to make argument before you offered the

12   testimony, or perhaps offer the testimony and then a bit of

13   argument?

14             MS. GARDNER:  I think if we offer the testimony

15   first and then make argument, that would be the best.

16             THE COURT:  Good.

17             Mr. Hendrix or Ms. Depper, what say y'all?

18             MR. HENDRIX:  That sounds like a game plan, Judge.

19             THE COURT:  Okay.  Good.  Well, let me get a fresh

20   pad, and let's do it.

21             Good morning, sir.

22             THE WITNESS:  Good morning, sir.

23             Mark Sedwick, Government's witness, sworn.

24             THE COURT:  Good.  You can be seated.

25             I'm sure Ms. Gardner's gone over the drill with you

1    on taking your mask down.

2              THE WITNESS:  Yes, Your Honor.

3              THE COURT:  Speaking out loud and clear.

4              Ms. Gardner.

5              MS. GARDNER:  And, Your Honor, we do have a pad of

6    paper and markers if something visual would be of assistance

7    to the Court.  We may or may not use it, but if it's helpful.

8              THE COURT:  Good.

9              MS. GARDNER:  If you'd like to see something, please

10   let us know.

11             THE COURT:  Thank you.

12                          Direct Examination

13   BY MS. GARDNER:

14   Q    Good morning.  Please state your name.

15   A    Mark Sedwick.

16   Q    Where do you work?

17   A    I'm a special agent with the Federal Bureau of

18   Investigation out of the Dallas division.

19   Q    And what is your division that you are in with -- at

20   Dallas?

21   A    Well, I'm under the CAST unit, the Cellular Analysis

22   Survey Team, which is actually a unit out of headquarters.

23   Q    To be in the CAST unit, do you have special background

24   education training?

25   A    We have training.  You can -- any agent or task force

```
 1   officer can apply and go through the process to become a CAST
 2   member, but to become a CAST member you have to have specific
 3   training.  That training is provided by other FBI agents who
 4   are already in the CAST unit, outside agencies, professors on
 5   how radio frequency works, which is how the cellphone
 6   communicates with the cell tower.
 7            And third and most importantly, I've been trained by
 8   the engineers from all the major service providers of the
 9   United States, AT&T, T-Mobile, Verizon, Sprint, Cricket and
10   Metro when they're their own companies.  I've been taught by
11   the engineers, the people who design and build the networks.
12   Q    And how long have you worked in the CAST unit?
13   A    I was certified in 2014.
14   Q    And on a daily basis, what are some of the things that
15   you work on?
16   A    It depends.  I'm a field asset, so I am assigned to the
17   Dallas division.  I can work cases.  Dallas could have me work
18   cases, but Dallas has me only work CAST.  All I do is cellular
19   analysis, and I'm also a member of the SWAT team.  So that's
20   my only other collateral duty.  So my normal day is I'm doing
21   cellular analysis.
22   Q    And the CAST team does cellular analysis not just for
23   federal cases but also for state matters; is that correct?
24   A    Yes, ma'am.
25   Q    Are you often called to testify in state court?
```

1   A     Yes, ma'am, I am.

2   Q     Okay.  What are some of the types of cases that you have

3   been called to testify in?

4   A     Homicides, kidnappings, serial robbery crews, the big

5   ones, some dope cases, narcotics.

6   Q     Have you also been called to testify in federal cases?

7   A     Yes, ma'am.

8   Q     Let's just start with a general explanation of what NELOS

9   data is.

10  A     What NELOS is, is it was a database, it was designed by a

11  man named Sheldon Meredith, and it was basically to --

12  designed to test the health of the 3G network for planning and

13  troubleshooting.  It is a passive system where, while the

14  phone is on the control channel communicating with the network

15  across the control channel, it would passively pull whatever

16  location data it could pull or data to compute location from

17  that device.

18        That way they could use that data after it goes

19  through an algorithm, then they could determine the latitude

20  and longitude with a level of uncertainty where that device

21  was.

22        They use that to, for future planning of, hey, we

23  don't have -- there's dropped calls in this area, why is this

24  happening, hey, we need to put a new tower up in this area, to

25  invest the money to build that infrastructure to design the

1   network so it runs more efficiently in the 3G world.

2   Q    Okay.  And is this distinctive to AT&T only?

3   A    Yes.

4   Q    Okay.  So AT&T developed this system to gather data in

5   order to make investments in their own network, so to speak?

6   A    Yes, ma'am.

7   Q    Okay.  And based on that, has AT&T stuck with this system

8   as it relates to the 3G network?  Has it been useful to AT&T

9   throughout the years?

10  A    Yes.  Obviously they are letting it lapse because the 3G

11  network is now going out of existence.  Probably by the end of

12  2022 is the last that when we talk to the engineers, is

13  probably when the 3G system will no longer be operational in

14  the United States.

15       NELOS also became the generic term for any kind of

16  location data.  So depending, there might be other databases

17  that were also pulled into the NELOS report that we receive

18  from AT&T.  Just from that report there's no way to determine

19  what other databases that was pulled from.

20  Q    Okay.  So it's general location data.  We'll talk about

21  this in a second, but it's pulled through an algorithm and

22  then gives results; is that correct?

23  A    Yes, ma'am.

24  Q    And AT&T over the years has found this to be reliable

25  enough to make multi-million-dollar business decisions?

```
 1   A     Yes, ma'am.

 2   Q     Okay.  Let's talk a little bit about how NELOS works.

 3   A     As I stated, it pulls, as the phone -- it has to be

 4   communicating with the network.  If it's just camped on a

 5   tower where it's, you know, not in a call or text or in a data

 6   session, a registration where it's not actively communicating

 7   with the network, there will be no NELOS data produced.  It

 8   has to be communicating with the network, and then it's

 9   passively pulling that data.

10         The one issue with the NELOS data is it's pulled off

11   of a what's called a TMSI.  Every phone is assigned an IMSI,

12   an international mobile subscriber identifier number, within

13   the network.  That IMSI is never broadcast across the network,

14   they get assigned TMSIs.  That TMSI sometimes can get

15   reallocated and then allocated back to a device, so you can

16   have sometimes where the NELOS data will pull from a different

17   device and get put into the records for the device that you're

18   requesting.

19         It's generally usually very obvious.  It will travel

20   where there's no physical way the phone could travel that

21   distance and get back in that timeframe.  It's generally

22   usually very obvious.

23         The other issue is with -- since it does use the

24   TMSIs, if there is no call or text within very close proximity

25   to the NELOS data, we won't use it because, you know, if I
```

have a call and I have a NELOS data two seconds after that,

that NELOS data is most likely, you know, very probable that

it's from that device based on the aggregate.  A single point,

no.  If I have three or four points within a short time, I

have an aggregate, then, yes, I feel it's confident that it's

that device.  But if I don't have the supporting call detail

records with a call or a text, I don't -- I can't say that,

yes, it's the device.  So we won't use that.

Q    Okay.  And some of the other things that you use to

corroborate the NELOS would be where the cell tower is in --

what cell tower that phone is using; is that correct?

A    Yes.  Obviously if I get a NELOS usage and it's not --

and that NELOS is not within the approximate coverage area of

that tower, then that's not that device.

Q    It's an outlier?

A    It's an outlier.

Q    Explain a little bit how, or in my understanding, AT&T

calls it network events, those things that are passively going

to the system; is that correct?

A    Yes, NELOS stands for, or we always called it NELOS, and

then we had a conference, and the -- Mr. Meredith spoke to us

at it, and he goes, it's pronounced NELOS, so we've corrected

that, and I still will mess up which way I say it.

        But we -- can you repeat it?  I'm sorry.

Q    What are the events?

A     The events is a call, a text, a data session or a
registration, which is, a registration is just reaching back
out to the network saying, I'm here, I'll still on.
Q     Okay.  What are some kinds of the data that is involved
in doing the computation?
A     It will be the cell tower the phone was on, it could be
timing advance, which is how long it took the signal to go
from the tower to the phone and back to the tower.  They
compute that.  The RF signal in the vacuum travels at the
speed of light, so they can compute how long it took the round
trip time, time in advance, that can give the distance from
the tower.

         They can take other, just the signal strength, how
strong it sees the tower, all these other datas.  It can pull
GPS, if you have GPS on the device.  It can pull all -- it
pulls as much data as it can, enters it into the algorithm,
and then you get your latitude and longitude and a level of
uncertainty.  And sometimes all you'll get is, it will center
on a cell tower.  So it basically knew, hey, it was on this
cell tower, that might be only the data it gets.
Q     Okay.  So the device is sending various different events,
they're plugged into that algorithm, and essentially the
algorithm will spit out what it computes as accuracy; is that
correct?
A     Yes, ma'am.

```
1   Q    Okay.  And that can be anywhere from, for example,
2   10,000 meters down to 25 meters?
3   A    Yes, ma'am.
4   Q    And what is the difference between having a 10,000-meter
5   result and having a 25- or 50-meter result?
6   A    Well, if I have a 10,000-meter 25, generally those are
7   located -- the last and long will be of the cell tower, so it
8   basically tells me it used that cell tower.  Well, if I have
9   call detail records, I can actually narrow it down better by
10  sector.  So it really doesn't assist me at all.  But if I get,
11  you know, 600 or less, I've gotten more data.  If I get a 25
12  to 50, I can't say a hundred percent sure, but I'd say
13  probably GPS was most likely involved in that event, but I
14  can't say that with a hundred percent.
15  Q    And when you say GPS was most likely involved in that
16  event, that means the device that sent the data to the
17  algorithm, a point of GPS was used in that?
18  A    Yes, ma'am.
19  Q    Okay.  Which would make it more accurate than an event
20  sent that didn't have it?
21  A    Yes, ma'am.
22  Q    Okay.  So in and of itself, what the algorithm spits out
23  is accurate as far as that algorithm is computing?
24  A    Yes, ma'am.
25  Q    Okay.  There's no question that when you get a
```

 1   10,000-meter hit, it is 10,000 meters according to the

 2   algorithm?

 3   A    Yes, ma'am.

 4   Q    Okay.  When you get a 25-meter hit, it is 25 meters

 5   according to the algorithm?

 6   A    Yes, ma'am.  I mean, if it was 27, I wouldn't argue that

 7   point, but, yes.

 8   Q    Okay.  All right.  So within that radius?

 9   A    Yes, ma'am.

10   Q    Okay.  Now, you said you use this in the aggregate, and

11   you don't use NELOS data unless it can be corroborated by

12   other known factors; is that correct?

13   A    Known factors based on the call detail records, yes,

14   ma'am.

15   Q    Okay.  So talk to us a little bit more about using this

16   data in the aggregate.

17   A    So if I -- even if I have a -- I just have a point, even

18   if I have a call or a text that I can 90 percent, 99 percent

19   sure that it is the call or text associated with it, if I just

20   have one, I still might use it, but I wouldn't -- I still

21   can't a hundred percent say, yes, that is the device, even

22   though I can never hundred percent say it is the device

23   because of the TMSI issue.

24           But if I have four or five points, three or four

25   points within a couple minutes of each other, I've got an

1   aggregate.  I've got more data coming in to say that, yes,

2   this is the accurate location of that device.

3   Q    And you would take those four or five points along with

4   what you have a known cell tower and sector, correct?

5   A    Yes, ma'am.

6   Q    And if -- and align all of those, and with certainty that

7   it's within whatever that 50 radius is?

8   A    Yes, ma'am.

9   Q    Okay.  If we see -- and I'm going to give the judge the

10  NELOS data in just a second, but if we see that a device goes

11  from, say, 2500 meters up to 10,000 meters, back down to

12  50 meters and then back up, what does that indicate?

13  A    Just at that point in time what data the device was

14  sending back to the network.  It's, you know, at the -- you

15  have a 10,000-meter, it only had so much data, so that was the

16  best the algorithm could come up with.  The next, you know,

17  five seconds later it got better data, so it had more data to

18  go into the algorithm to compute that level of uncertainty.

19  Q    So it doesn't mean that the phone necessarily moved?

20  A    No, ma'am.

21  Q    Okay.  Has nothing to do with movement of the phone?

22  A    No, ma'am.

23       MS. GARDNER:  All right.  Your Honor, if I may

24  approach, I'm going to hand you what is government's

25  exhibit 1.

1          (To the defense) And this is just your PDF of the

2   NELOS.

3          THE COURT:  Thank you, Ms. Gardner.

4   BY MS. GARDNER:

5   Q    Mr. Sedwick, do you have a copy of this?

6   A    I do not.

7   Q    This is government's exhibit 1.  Take a look at it.

8          Okay.  Is that a record that would have come from

9   AT&T?

10  A    Yes, ma'am.

11  Q    And what is represented on that record?

12  A    This is the NELOS reports, the historical precision

13  location information for telephone number (501)693-6774.

14  Q    Okay.  And is this the NELOS data, not maybe in this

15  format, but the NELOS data that you used in your analysis in

16  this particular case?

17  A    Yes, ma'am.  AT&T will send this in this PDF, and then it

18  will also send it in a text file.

19  Q    Okay.

20  A    I use the text file.

21  Q    I believe if we could turn to page 31.

22  A    Yes, ma'am.

23  Q    Is there a section there that's highlighted just for

24  reference?

25  A    Yes, ma'am, there is.

1  Q    Okay.  Could you explain a little bit what those -- what

2  that series of data points means as far as you looking at this

3  data?

4  A    What we have is between -- and AT&T sends their records

5  in universal time coordinates, or UTC, so I have to adjust for

6  the local time.  In this case we are in the month of September

7  in the central time zone, so the local time would be five

8  hours behind.  So for local time, this is from 5:27 -- or,

9  excuse me, 12:27 to 12:30 a.m., and I have a series of nine

10 NELOS events.  The first one -- or, 10, excuse me.

11          The first one, there's 25 meters at 12:27:23, then

12 12:27:24.

13          MR. HENDRIX:  I'm sorry to interrupt.

14          Can you tell me what item?  I'm having trouble

15 locating.

16          THE WITNESS:  Oh, yes, sir.  It's item number --

17 they go backwards.

18          MR. HENDRIX:  Uh-huh.

19          THE WITNESS:  So it's starting at item 1166 on

20 page 31.

21          MR. HENDRIX:  Perfect.  Thank you.

22          THE WITNESS:  Let me get my ruler out so I'm not

23 jumping lines.

24          So basically line 1166, that's 5:27:23 UTC, or

25 12:27:23 local.  We get 2500 meters.  Then a second later we

```
1    get 25 meters.  Then we have a second one at that same time of
2    25 meters.  A second after that, at 12:27:25, we get a
3    location accuracy unknown.  Then I have at 5:27 -- or 12:27:48
4    I have two of 50 meters, and then at 12:29:43 I have two of
5    25 meters.  And then at 12:30:07 I have two of 50 meters.
6            So I have several points in a very small timeframe
7    with very good location of, you know, 25 to 50 meters.  So in
8    the aggregate, I can say that device was in that 25- to
9    50-meter radius of those NELOS events.
10   BY MS. GARDNER:
11   Q    Okay.  And in addition to just reading out those 25 to
12   50-meter radiuses, you took the lat. and long. data in this
13   case and verified that it was on the right cell tower?
14   A    Yes, ma'am.  There were calls or texts in that same
15   timeframe, and the NELOS data fell within the coverage area of
16   that tower and sector for those calls and texts that were
17   occurring at that same time.
18   Q    Okay.  So you not only looked at the historical cell
19   data, cell tower data, you also looked at the cell toll
20   records to verify that there was an activity on the phone, as
21   well?
22   A    Yes, ma'am.  The call detail records, they're basically
23   toll records with the tower information, so it's one record.
24   Q    It's one record, but they're two different pieces of
25   information?
```

```
 1  A    Yes, ma'am.

 2  Q    So you took the piece of information that the phone was

 3  active, was receiving or sending a text or doing a call,

 4  correct?

 5  A    Yes, ma'am.

 6  Q    You also took the lat./long. that it was talking to, the

 7  cell tower and the sector.

 8  A    Yes, ma'am.

 9  Q    And then you also looked at, was it -- was it a NELOS

10  point that would assist in narrowing down the accuracy within

11  that sector?

12  A    Yes, ma'am.

13  Q    Okay.  If you hadn't had all three, or two pieces of

14  supporting data for those NELOS points, could you have used

15  that in your analysis here?

16  A    No, ma'am, I would not have used it.

17  Q    Okay.  So for each of the NELOS points that you have put

18  forward in this case that you feel the confidence in

19  testifying about, you had the similar kind of supporting data?

20  A    Yes, ma'am.

21  Q    Tell us a little bit about what you have to go through to

22  get approval to even use NELOS in a court setting.

23  A    If I'm going to use NELOS in a court setting, I have to

24  get headquarters approval from our unit -- our supervisors and

25  everybody at headquarters because they want to make sure that
```

```
1   we're not -- I have the supporting data to use it.

2   Q    So pretty much FBI does not want you going out and

3   testifying willy-nilly about NELOS data?

4   A    Yes, ma'am.

5   Q    It is only able to be testified about when the -- when

6   the accuracy has met a peer review and can be corroborated?

7   A    Yes, ma'am.

8   Q    How frequently is NELOS data like this used in trial?

9   A    Not that frequently.  Generally when it's -- we have it

10  and it can be used, they -- trials don't happen a lot of the

11  times, but I know it's -- it has been used, but it's not

12  frequent.

13  Q    Okay.  In other cases that you have looked at, have you

14  had NELOS data but not the kind of NELOS data that would

15  actually assist in narrowing down the scope of the phone?

16  A    I've had cases where I've known -- I have known points, I

17  have known times, known locations or fits the narrative, but I

18  don't have the supporting calls or texts, so I cannot use it,

19  even though I'm -- I'm very confident that's exactly what that

20  device did, the travel it did, but without the supporting

21  data, I'm not going to say it in court because I can't -- I

22  have nothing else to support that data.

23  Q    Okay.  And, again, in this case you did have that

24  supporting data?

25  A    Yes, ma'am.
```

```
 1   Q    In this case, I believe we have a series of approximately
 2   six points over a course of time, correct?
 3   A    Yes, ma'am, six or seven.
 4   Q    And you had the necessary supporting data along with the
 5   25 or 50-meter radius NELOS data to be confident about six
 6   points; is that correct?
 7   A    Yes, ma'am.
 8   Q    All right.  Other than testifying and using NELOS data,
 9   what else do you use it for in your daily activity?
10   A    If I have it, I'll use it in my investigative.  If I'm
11   looking for -- I've had cases of kidnapped children, missing
12   children, where all I've had is NELOS, and I've used that to
13   locate the missing child or use that -- I had a case where a
14   child went missing, parents were saying it was a kidnapping,
15   we were pretty sure it was the parents had killed the child,
16   and was able to use the NELOS data to show, because the father
17   was basically saying, I never left the house, and I was able
18   to show that the NELOS data that his device left the house,
19   went to a body of water and came back, and they found the
20   child in the body of water, and he took us to the body of
21   water based on that data.
22   Q    Okay.  So in your day to day experience, even if you
23   don't have all of the supporting data necessary to testify at
24   trial, you have found that NELOS data has been accurate?
25   A    Yes, ma'am.
```

1  Q    And, again, in this case you do have enough supporting

2  data that you have been approved to testify?

3  A    Yes, ma'am.

4            MS. GARDNER:  I'll pass the witness.

5            THE COURT:  Thank you, Ms. Gardner.

6            MR. HENDRIX:  Judge, what I may ask, if you're

7  willing, is let me go down this road as far as I can exhaust

8  it, and then if I could ask you for a break for me to consult

9  with Mr. Sloves, then maybe come back to see what I need to

10 tidy up.

11           THE COURT:  I'm always in favor of consulting with

12 people that know things, so, and breaks.  I can get a snack,

13 Mr. Hendrix.  You know me.  It's almost time.

14                      Cross-Examination

15 BY MR. HENDRIX:

16 Q    Mr. Sedwick, so when -- how many cases have you testified

17 in about NELOS records?

18 A    This will be the first that I've testified.

19 Q    First time testifying in a courtroom about NELOS records?

20 A    Yes, sir.

21 Q    Okay.  And since we're dealing with scientific knowledge,

22 my question to you first is:  What is your level of certainty

23 that you can testify under oath to about the reliability of

24 NELOS data?

25 A    I believe that NELOS data is very reliable.  The only

1    issue is that TMSI issue, and that's generally very rarely

2    apparent, because it will time travel.  The device, you know,

3    it's physically impossible for the device to do that.  Now,

4    that's why we take in the aggregate.  If I have just that one

5    single point, I can't say.

6    Q    Yeah, we'll get to that in a minute.

7           Here's what I'd ask for you to comment on.  At the

8    top of NELOS records, AT&T says:  "The results provided are

9    AT&T's best estimate of the location of the target phone.

10   Please exercise caution in using these records for

11   investigative purposes, as location data is sourced from

12   various databases, which may cause the location results to be

13   less than exact."

14          So how -- what is your comment about AT&T's own

15   disclaimer about the reliability of it's --

16   A    Well, it has a built in -- because it's less than exact,

17   it has a built in, the accuracy.  That's that level of

18   uncertainty.  If it was exact it would be lat. and long. right

19   there.  You can't -- that doesn't exist.  You know, even with

20   GPS, you're driving down the road with your car with your GPS,

21   you're on the highway and all of a sudden your GPS says you're

22   on the feeder road or the side road 200 meters away.

23          Well, it's still accurate.  You're still within that

24   area.  That's why they have that built-in level of

25   uncertainty.

1   Q    Yeah, but I guess what I'm getting at is I'm hearing you

2   say, I can take an oath and testify to a high degree of

3   certainty to the reliability of NELOS data, whereas isn't a

4   common-sense reading of AT&T's disclaimer is, it's not

5   reliable, don't use it for investigative purposes?

6   A    No, sir.  It just says, it basically states you need to

7   use caution.  I wouldn't rely on it if all I had was a NELOS

8   point putting someone at a scene and that's all I had, no, I

9   would not use it.  I'm using it -- there is a caution with it,

10  but I'm using it in the context of I have call and text to

11  support it, I have other data to support, I have very good

12  precise NELOS data.  I feel very, very confident that this is

13  accurate.

14  Q    All right.  So you have been briefed by AT&T engineers?

15  A    Yes, sir.

16  Q    And my understanding from Lance Sloves is they don't let

17  defense experts get briefed by AT&T engineers.

18  A    I don't -- that's AT&T.  I don't have any say over that.

19  That's AT&T.

20  Q    Okay.

21  A    I've also been taught by the man who designed NELOS.

22  Q    Yeah, yeah, yeah, McCormack, or whatever.

23  A    No, Meredith; Sheldon Meredith.

24  Q    Okay.  And so why would AT&T or AT&T at Mr. Meredith's

25  direction, why are they saying there is imprecision involved?

1    Can you tell us the reasons why AT&T is saying, our data
2    shouldn't be relied on?
3    A    They're not saying it shouldn't be relied on, it should
4    be used with caution.
5    Q    Let me stop you right there.  I'm sorry.
6         Why?  Why is AT&T saying that?
7    A    As I've stated, because the main issue is because of the
8    TMSI, where the device can -- it can report back data from the
9    wrong device because it's based on TMSI.  That's why I want to
10   have those calls and texts that lead me to, yes, this NELOS
11   data is for the device that it's saying.  If I don't have
12   those calls and texts that place it within the same tower and
13   sector, that's when I know that can be the outlier.
14   Q    Yeah.  So tell me if I'm right.  What I hear you saying
15   is, I can't use NELOS data alone in arriving at a conclusion
16   about a cellphone's location.
17   A    Yes, sir.  What it can do is, NELOS basically can narrow
18   down within that tower and sector where that device was.
19   Q    Okay.  I'm not sure if -- maybe I said my question wrong.
20        You can't use just NELOS data to pinpoint the
21   location of a cellphone at a specific time and place?
22   A    That's what I stated, sir.  I need the verification of
23   the call detail records along with it.
24   Q    And so you have to have corroborating information?
25   A    Yes, sir.

1   Q     And in this case it's the CDRs, call detail records?

2   A     Yes, sir.  As I stated, that's what I use.

3   Q     Yeah.  Anything else?

4   A     As far as -- like if I had -- in certain cases if I had

5   no video, like we see the subject, you know, at a known

6   location at a known time, and that's something else that, yes,

7   adds more to it.

8   Q     And so in this case, your corroborating information to

9   make sure the NELOS conclusion is reliable are the call detail

10  records, meaning the pings off the cell towers?

11  A     Well, they're not pings, but, yes, sir.

12  Q     And then you don't know the range of those cell towers,

13  right?

14  A     I can determine, based on the network, the approximate

15  coverage area of those towers, and what I can state is the

16  NELOS data I'm using is within the coverage area of those

17  towers so that NELOS data is narrowing the area where that

18  phone could be.  It helps me go, yes, it's in this coverage

19  area of this tower, and it could be within -- it would be

20  within the level of uncertainty of those NELOS hits.

21          MR. HENDRIX:  Pardon me one second.  I've just got

22  to get a drink of water.

23  BY MR. HENDRIX:

24  Q     How do you determine range of the cell tower?

25  A     Based on the other towers in the area, based on the

```
 1   network.  Because the network is designed to overlap, and

 2   they'll go approximately 70 percent of the distance from one

 3   tower to the other.  That's approximate.  Terrain, everything

 4   has that -- by looking at the terrain that other towers on the

 5   ground, I can determine the approximate coverage area of the

 6   cell tower.

 7   Q    Am I right, are there basically four cell towers at play

 8   in this case?

 9   A    Like the pertinent around the area?

10   Q    Yes.

11   A    Yes, sir, I believe that's right.  Yes, sir.

12   Q    And so have you reached a conclusion as to the range of

13   those four towers?

14   A    I could go into it, but some of them I'd have to measure

15   it.

16   Q    Well, instead of bogging us down, I can get that

17   information some other time.

18   A    Well, I'd say these towers cover a mile and a half to

19   mile and a half-ish average.

20   Q    Got it.

21        And it's because it's a rural area, right?

22   A    Yes, sir.

23   Q    Urban area, that range, it's going to be more precise,

24   right?

25   A    Yeah.  In an area like the downtown Little Rock, it's
```

1    probably three or four blocks.

2    Q    Yeah.

3           Now, corroboration.  The ultimate corroboration in

4    this case is actually doing the drive test, right?

5    A    Yes, sir.

6    Q    Did you do that?

7    A    No, sir, I could not in this case.

8           THE COURT:  I didn't hear you, Mr. Hendrix.

9    BY MR. HENDRIX:

10   Q    The most accurate corroborating evidence is to do what's

11   called the drive test.  And so tell Judge Marshall what the

12   drive test is.

13   A    The drive test is we take equipment, it's basically a

14   scanner, it passively listens to the RF environment and plots

15   the signal strengths as I drive around.  And then when I drive

16   test, I literally drive every street, everywhere I can get my

17   vehicle.  Guys have done it, gotten in boats, ATVs, to go into

18   wooded areas to do this drive test.  And that will give me the

19   dominant area of that tower and the total coverage area where

20   there's a useable signal.

21          In this case it was four years after the fact when I

22   first got involved in this case, so the network's not the

23   same.  Some of these 3D towers don't exist anymore.  So I

24   could not do an accurate drive of what the environment was at

25   the time.

```
1    Q    Right.  I completely understand.  And the circumstances

2    have changed, and that's what's prevented you from using the

3    most reliable method of corroborating these conclusions?

4    A    I wouldn't say it's the most reliable, but it's another

5    way to corroborate -- instead of being able to say this is the

6    approximate coverage area, I could say this is where this

7    tower ends.  I just can't do that in this case.

8    Q    Okay.  All right.  So let's talk about AT&T's algorithm.

9    That's what Meredith invented, right?

10   A    Yes, sir.

11            THE COURT:  Mr. Hendrix, I'm slow.  I'm still back

12   on the drive method, writing my notes here.  Give me just a

13   second, please.

14            MR. HENDRIX:  Yes, sir.

15            THE COURT:  The drive test is linked to the tower

16   coverage issue, right?

17            THE WITNESS:  What the drive test does, Your Honor,

18   is --

19            THE COURT:  That's not my question.  I'm sorry,

20   Agent.

21            THE WITNESS:  Okay.

22            THE COURT:  I'm trying to fit the pieces together

23   here.  What I thought I heard you testifying was the drive

24   test was the most accurate method of determining the cell

25   tower coverage.
```

```
 1              THE WITNESS:  Yes, sir, it is.

 2              THE COURT:  Okay.  Good.

 3              THE WITNESS:  I'm sorry, I misunderstood your

 4   question, Your Honor.

 5              THE COURT:  With these masks and my slow formulation

 6   of words, it's understandable.

 7              All right.  Enough on the drive test.  Now you were

 8   moving, Mr. Hendrix, to what?

 9              MR. HENDRIX:  To the algorithm, but if I could take

10   one more step back to the drive test.

11   BY MR. HENDRIX:

12   Q    And so the drive test is dealing with the range of the

13   cell towers?

14   A    The coverage area, yes, sir.

15   Q    Which is one of the found -- which is I guess the

16   foundation for you to draw conclusions about geo-location with

17   the NELOS records?

18   A    Yes, sir, I'd -- I would have to say that NELOS data has

19   to be within the coverage area of that tower for it to be

20   accurate.  Obviously if it was wrong, that would be something

21   that would be the outlier.

22   Q    Right.

23   A    But based on my training and experience, the cell towers

24   have coverage area that includes the areas where that NELOS

25   data was computed.
```

```
 1   Q    Right.  And I think we're saying the same thing.  For you
 2   to -- for you to say that the NELOS has reliability, you need
 3   the cell coverage, the -- right, to corroborate -- you can't
 4   do one without the other.
 5   A    Yes, sir.
 6   Q    Okay.  So if one is unreliable, the whole thing's going
 7   to be unreliable?
 8   A    I -- I guess I'm not sure what you're saying if one is
 9   unreliable.  I guess, because they're both reliable, and I
10   think you're trying to get me to say that one of these is not
11   reliable, and that's not true.
12   Q    No.  Actually what I'm getting at is the relevance of the
13   drive test, right?  And that goes to the cell tower coverage,
14   which is part of the analysis, along with the NELOS, to arrive
15   at a precision -- a conclusion.
16   A    Yes, sir.
17   Q    Okay.  All right.  Algorithm, Meredith.  How long ago,
18   out of curiosity?
19   A    I don't remember when he first wrote that.  It was when
20   the 3G network first started coming.  So several years ago.
21   Q    Yeah, ballpark it for me, just because I'm curious.
22   A    I honestly don't -- I don't even want to try to ballpark
23   it.  I just don't remember exactly when that -- I don't know
24   when he wrote that algorithm.
25   Q    Okay.  And I assume that's proprietary --
```

```
 1   A     Yes, sir.

 2   Q     -- information, right?

 3   A     Yes, sir.

 4   Q     And AT&T's not letting it out?

 5   A     No, sir.

 6   Q     So how do we know that it's been tested for reliability?

 7   A     Because AT&T relies on that to make multi-million-dollar

 8   decisions on how they're going to design their network.

 9   Q     Sure.  Do you think AT&T's ever made bad

10   multi-million-dollar decision?

11   A     I think they're a pretty successful company, so . . .

12   Q     Sure.  As an old client of mine said, I make a lot of

13   money, but I lost a lot of money, too.  You think AT&T -- I'm

14   speculating here.

15   A     Well, I'm not going to answer a speculating question,

16   sir.

17            THE COURT:  Judge Arnold has an interesting story

18   about this.  Do you know how to make a small fortune in horse

19   racing?

20            MR. HENDRIX:  How?

21            THE COURT:  Start with a large one.  Apparently at

22   some point in his life he owned race horses.

23   BY MR. HENDRIX:

24   Q     Let's see.  Where was I?  I was speculating about

25   something.
```

```
1   A    You're speculating the -- actually, I don't remember.

2   Q    Oh, right.  Yeah.

3   A    The algorithm that AT&T is relying on something that

4   doesn't work.

5   Q    Yeah.  Ultimately what I'm getting at, I don't mean to be

6   facetious about it, but I hear what your testimony is.  It

7   must be -- the algorithm must be reliable, because AT&T is a

8   successful company.

9   A    Well, that, and the man who designed it knows it works

10  through other tests, and they will verify it through other

11  testing.

12  Q    Yeah.  But it's proprietary information that is there for

13  a business purpose, right?

14  A    Yes, sir.

15  Q    It was not an algorithm designed for forensic purposes?

16  A    No, sir.

17  Q    It was not.

18  A    Well, it's forensics as far as testing the planning and

19  health of the network.  Yes, it is forensics in that sense.

20  Q    That's not what it was designed for.

21  A    It was designed to show the health of the network --

22  Q    Yeah.

23  A    -- for planning and troubleshooting.  So, yes, it is

24  forensics.

25  Q    Well, okay, I'm going to have to just disagree with you.
```

1   You're applying it in a forensic setting, but the algorithm

2   was not invented and its purpose has not been for criminal

3   cases.

4   A    Oh, no.  Yes, sir, forensics isn't just criminal,

5   so . . .

6   Q    Okay.  It would have been helpful to you and us if -- the

7   best reliability is going to have an actual -- is having the

8   actual phone, right?

9   A    Not necessarily, sir.

10  Q    Isn't that -- having the phone -- now they have GPS data

11  on the phones, right?

12  A    That depends, sir, because if you do a Cellebrite dump of

13  a phone, you might not pull any good location data off of that

14  Cellebrite dump.  It's all dependent on what is stored on the

15  phone, how it's pulled and what's been deleted.  So that

16  really -- yes, you can get great data from a forensics dump of

17  a phone, and you can also get absolutely nothing.

18  Q    So tell me how, if you turn -- location services on your

19  phone, right?

20  A    Yes, sir.

21  Q    How does it affect an analysis for geo location purposes

22  if your location services is off?

23  A    Well, I don't have -- because usually when I get geo

24  location as far as GPS or something like that, I'm either

25  getting it from Google or I'm getting it from the device

1  itself.

2  Q    Uh-huh.

3  A    So that basically gives me more data to analyze.

4        In this case, I don't believe the phones were ever

5  recovered, so that's just one thing I do not have.

6  Q    Okay.  Let me try again.  If the location services is

7  off, how does that affect your analysis?

8  A    It doesn't, sir, because the cell -- the cellphone

9  talking to the cell tower for CDR purposes does not rely on

10 GPS from the device.  It's the tower, the tower and sector the

11 phone chose at the beginning of the call, the strongest signal

12 with the least amount of interference.  Now, that could affect

13 what is input into the NELOS data.

14 Q    That's what I -- I couldn't have been clearer.  That's

15 what I'm focusing on.

16 A    Well, the way you were stating that, you were talking to

17 the network, that's CDRs.

18        Yes, if your GPS is on and it's getting a good

19 signal and the phone reports that back in that timeframe,

20 because sometimes it might not, that will give you a more

21 accurate NELOS data.

22 Q    And without the phones, we don't know whether Don Smith's

23 location services was on or not, right?

24 A    No, sir, there's no way to determine that.  But with very

25 good accurate -- 25 to 50 meters logically could have been on,

1    but I can't say.  No, I cannot say that.

2    Q    Yeah, and I think that seems to be just another common

3    sense problem with it, is the NELOS, it's -- the data could be

4    from other devices, other phones, right?

5    A    Yes, sir, and that's what I've stated is the -- that's

6    the main limitation why we are very conservative on how we use

7    it.

8    Q    And if I understood what you're saying is you take the

9    NELOS records, and when you see some measure of consistency

10   over three or four or five events, then you are drawing your

11   conclusion that must be correct?

12   A    I'm still saying that -- that's my conclusion, but I

13   would -- what I'd state is, this could narrow down where the

14   phone could be within that sector.  I can't a hundred percent

15   say, no, I can't a hundred percent say, yes, that NELOS point

16   is that device at that time, but based on the aggregate and

17   all the other information, yes, it is.

18   Q    And so is there a norm in your business of how many data

19   points you need to draw a conclusion with a high degree of

20   certainty?

21   A    You want at least two or three.

22   Q    That's it, just two or three?

23   A    Based on with calls, yes.  You'd rather have more points,

24   but if you're in a very narrow timeframe, you're only going to

25   have two or three points in a narrow timeframe.

1  Q    So if you get three readings of 25 meters -- well, I --

2  let me take a step back.  The second part of that equation

3  seems to me, then, is how many data points for reliability,

4  and then within what period of time, yeah?

5  A    Well, it's all relative because of what I'm getting from

6  the NELOS data.  In this case I have where I'll get three or

7  four points within a few minutes of the other, obviously

8  associated with a call or text, that gives me very high

9  confidence that it's accurate.

10  Q    Well, and Agent, what I'm getting at is in most

11  professions, doctors, lawyers, engineers, cell people, there

12  are standards of practice, right?

13  A    Yes, sir.

14  Q    Okay.  In your industry there are norms, right?

15  A    Yes, sir.

16  Q    What is the norm for you to use -- drawing a conclusion

17  from an aggregate?  And I'm hearing you say three data points

18  is good for me.

19  A    Yes, sir, in this case the couple times I only had the

20  three data points.  Would I like to have had more?  Yes.  But

21  in that narrow timeframe I only got those three, but I can

22  associate those NELOS with calls or texts.  In the aggregate I

23  have that data, and it's just narrowing down where that phone

24  could be.  I know it is in that tower and sector.

25  Q    If you're relying on three data points over -- and I

```
 1   don't guess we answered the second part of that equation.  In
 2   order for you to make a reliable conclusion, those data
 3   points, do they have to be within a certain timeframe?
 4   A    I'd want them in a narrow timeframe.  If I had three data
 5   points two hours apart, each one was two hours apart, that's
 6   not an aggregate.
 7   Q    Okay.  So three data points two hours apart, you're not
 8   going to draw a conclusion?
 9   A    No.
10   Q    All right.  Start narrowing that down for us.
11   A    But I've got three data points within a few minutes of
12   each other, a minute or two.  I feel confident in that.
13   Q    And so if you've got three data points within what'd you
14   say, two or three minutes?
15   A    Couple minute, yes, sir.
16   Q    Then you feel comfortable drawing a conclusion?
17   A    Yes, sir.
18   Q    What if the fourth data point was contrary to those
19   three, the one that you don't have, is that going to
20   completely mess your conclusion up?
21   A    It would depend on, I'd have to see, because if it flies,
22   you know, if it time travels, it's 20 miles away, that was a
23   wrong TMSI grab.  It's obvious.
24   Q    All right.  So I'm going with three data points within
25   three minutes to establish reliability.  Is that a norm in
```

```
 1    the -- is this a written norm?  Is there some textbook I can
 2    go read that says, hey, people in the industry, you can draw
 3    reliable conclusions based on three data points within three
 4    minutes?
 5    A    I don't know, sir.
 6    Q    It's not written down anywhere, is it?
 7    A    Not that I know of.
 8    Q    Who taught you that?
 9    A    That's based on my looking at this data and what I have,
10    I can only have with the data I have, and I feel confident in
11    the data I have.
12    Q    Nobody taught you that is the bottom line.  Nobody's
13    teaching anybody in the world that, right?
14    A    I don't know, sir.
15    Q    Have you ever been to a seminar where they went, you can
16    draw reliable conclusions based on three data points in three
17    minutes?
18    A    Well, I don't know, sir, but I can rely on -- I can rely
19    on one data point and one point of time off a cell tower and
20    say that phone had to be on that sector based on one data
21    point and time.  So I think your analogy you're stating is
22    misleading.
23    Q    Tell me how it's misleading.
24    A    Because I can say that you were in this tower and sector
25    based on one point.  Now, I can narrow it down with the NELOS
```

```
 1   data.  I want to have more than one point of NELOS data in

 2   that timeframe.

 3   Q    Yeah.

 4   A    But I have three.  I feel confident in that.

 5   Q    I don't think it's misleading, I think you and I are

 6   actually saying the exact same thing.  You're drawing

 7   conclusions based on just the conclusions that you want.

 8   There is no industry standard that says, in order to achieve a

 9   level of certainty in your conclusions, the following factors

10   must be met, right?

11   A    Not that I know of, no, sir.

12   Q    Yeah.  Which, that's sort of what happens in, like,

13   medicine, right?

14   A    I don't know, sir.  I'm not a physician.

15   Q    All right.  Let's go to --

16           MR. HENDRIX:  And JoJo, can we pull up -- I want to

17   go back to item 1166.

18           And, Judge, I don't -- you have the written

19   document, don't you?

20           THE COURT:  I do.

21           MR. HENDRIX:  I don't.  I'm going to have to rely

22   on --

23           THE WITNESS:  I can tell you what, you want the time

24   and all of that of item 1166?

25   BY MR. HENDRIX:
```

```
 1   Q    Yeah, I'd like to have my eyes on it, too, as I work

 2   through, but I just -- let's take 1166, and if I understand

 3   the NELOS records, as the numbers get smaller is actually

 4   the --

 5   A    It's in reverse order.  It's in reverse chronological.

 6   Q    So we start at 1166.  1165 will be after?

 7   A    Yes, sir.

 8   Q    Got it.  Well, let's kinda work our way through.  So 1166

 9   tells us what?

10   A    There's a latitude and longitude level of uncertainty at

11   12:27:23 local time of accuracy likely better than

12   2500 meters.

13   Q    Okay.  And you have your CAST report handy?

14   A    Yes, sir.

15              MR. HENDRIX:  And does Your Honor?

16              THE COURT:  I think that was filed.  That's the one

17   with the pictures, right?

18              MR. HENDRIX:  Yes, sir.

19              THE COURT:  I have it somewhere here.

20              I have the NELOS report.  What page?

21              MR. HENDRIX:  Page 13.

22   BY MR. HENDRIX:

23   Q    And so Agent Sedwick, if I'm understanding this, data

24   point 1166 on the NELOS report, and we'll work through it.

25   And, again, I'm sorry, I don't have my eyes on it.  But 1165,
```

1    1164 and expand it to 1166, 1167, or 1167, '68, so forth.

2    Let's start branching out.

3              But that translates to page 13 of your CAST report,

4    right?

5    A    Yes, sir.

6    Q    And in that, your conclusion is 9/27/2016, that phone

7    number, which is Don Smith, and your conclusion is between

8    11:27:24 a.m. to 12:30:07 a.m., he was within 25 to 50 meters

9    of witness Jimmy Porter's residence, right?

10   A    Yes, sir.

11   Q    And that's based on item 1166 and the surrounding ones,

12   right?

13   A    Yes, sir.

14   Q    So is 1166 the 12:27:24 data point?

15   A    That's the 12:27:23 data point.

16   Q    12:27 -- okay.

17   A    Which I don't show, because that is a large level of

18   uncertainty centered on a cell tower, which does not narrow

19   down my area, because it's actually giving me the cell tower,

20   not even a cell tower and sector.

21             THE COURT:  I'm lost.

22             MR. HENDRIX:  My head exploded.

23             THE COURT:  I'm on page 13.  I'm looking for this

24   12:27:23 data point.

25             THE WITNESS:  Your Honor, I don't show the data

1    point, because that is a large level of uncertainty where the

2    latitude and longitude is centered on the cell tower that was

3    used, so it does not do anything to narrow down the location,

4    it actually expands it.

5                THE COURT:  I understood, and I understand what

6    Mr. Hendrix has done there by taking you outside your range

7    there.  I'm just trying to figure out how page 31 of the NELOS

8    report is translated into this drawing that I have on page 13

9    of your report, because I'm not seeing how things --

10               THE WITNESS:  Yes, sir.

11               THE COURT:  -- align or relate to one another.

12               THE WITNESS:  I show the data points from 12:27:24

13   to 12:30:07, the 25 and 50-meter ones.  It's a small circle

14   just under that P.  And then the next slide I zoom in on it.

15               THE COURT:  Okay.  I got the P, but I don't see --

16   there are just no references on page 13 that take me into the

17   NELOS data.

18               THE WITNESS:  The call box, it'd be to the right, it

19   says -- it's outlined in blue, says 09272016, lists the phone

20   number.  Then it says 12:27:24 a.m. to 12:30:07 a.m., 25 to

21   50 meters.

22               THE COURT:  So the boxes contain the NELOS data?

23               THE WITNESS:  Yes, sir, that particular box.  The

24   other boxes with the blue banners or the red banners contain

25   the call detail records for those devices.

```
 1              THE COURT:  I don't have the color copy.

 2              THE WITNESS:  Oh, sorry, Your Honor.

 3              THE COURT:  So you can't file -- I don't think color

 4    copies -- well, they're on the machine, you can file them, but

 5    then when they were printed out they're not in color.

 6              THE WITNESS:  Sorry, Your Honor.  I didn't realize

 7    you didn't have a color copy.

 8              THE COURT:  I see it now on the monitor.  Colors are

 9    helpful.

10              MR. MORLEDGE:  Your Honor, if I may approach, you

11    can have my copy.

12              THE COURT:  You have a color one?

13              MR. MORLEDGE:  I do.

14              THE COURT:  Mr. Morledge, how did you get favored

15    with a colored copy?

16              MR. MORLEDGE:  You know, Judge, I don't know.  Just

17    some people are blessed.

18              MS. GARDNER:  Your Honor, the trial notebook for the

19    judge should have the color copy.

20              THE COURT:  As an exhibit?

21              MS. GARDNER:  Yes.

22              THE COURT:  And maybe it is over here in the

23    exhibits.  I'm working from your motion papers.

24              MS. GARDNER:  No, it's in the exhibits.  There's a

25    full color copy.
```

```
 1              THE COURT:  All right.

 2              MR. HENDRIX:  And we got it up on the screen.

 3              THE COURT:  And I see it on the screen.

 4              What number exhibit, Ms. Gardner?

 5              MS. GARDNER:  Number 9.

 6              THE COURT:  All right.  Mr. Morledge.

 7              MR. MORLEDGE:  I'm going to take mine back if you

 8   don't mind.

 9              THE COURT:  No, I'm going to give it to you.  Now I

10   feel blessed.

11              MR. MORLEDGE:  Thank you.

12              THE COURT:  And we're on page 13.  Oh, yes, this is

13   much, much better.

14              Okay.  Mr. Hendrix.

15   BY MR. HENDRIX:

16   Q    Right.  And so item 1166 of the NELOS report is what

17   we're talking about.

18   A    Yes, sir.

19   Q    There it is.  And that is -- that's the data point that

20   then you use in the report on page 13?

21   A    I use data line 1165.  Since data point 1166 is barely

22   2500 meters and centered on a cell tower, it doesn't do

23   anything to narrow down where that device could be.  So I'm

24   not -- I didn't use it in my analysis.

25              THE COURT:  Which cell tower is the 1166 centered
```

```
 1   on?

 2           THE WITNESS:  I'd have to double-check, Your Honor,

 3   but I believe it's -- I don't want to say, because I'd have to

 4   double-check.

 5           THE COURT:  Okay.

 6           THE WITNESS:  I just know when I have those large

 7   data points it centers on one of the three towers I'm showing.

 8           THE COURT:  Okay.

 9           THE WITNESS:  I'd have to check which one was which.

10           THE COURT:  Got it.

11   BY MR. HENDRIX:

12   Q    Okay.  I think I get what you're talking about.  So let's

13   still stick with 1166 as a baseline.  And that shows UTC time

14   5:27:23, correct?

15   A    Yes, sir.

16   Q    Which is, what's our time?

17   A    12:27:23 local.

18   Q    12:27:23 a.m.?

19   A    A.m.

20   Q    And it's the location accuracy is better than

21   2500 meters, right?

22   A    Yes.

23   Q    Okay.  So I'm not a meter guy.  How -- what's

24   2500 meters?

25   A    600 -- little over a mile and a half.
```

```
 1   Q     Mile and a half.

 2   A     So basically the coverage area of -- the rough coverage

 3   area of the cell tower.

 4   Q     Got it.

 5              Okay.  Going forward in time, we actually go to

 6   1165, correct?

 7   A     Yes, sir.

 8   Q     Better than 25 meters?

 9   A     Yes, sir.

10   Q     And what's our time?  It's a second layer.

11   A     Yes, sir.

12   Q     And at the exact same time, then also less than

13   25 meters, I'm referencing 1164.

14   A     Yes, sir.

15   Q     And then the 1163 is one second later, and location

16   accuracy unknown.

17   A     Yes, sir.

18   Q     All right.  So you don't have your three data points at

19   that point, right?

20   A     That point, no, sir.

21   Q     Okay.  1162, and that's about 22 seconds later, location

22   accuracy, and then you go through, I'll just do them in a row,

23   50, 50, 25, 25, 50 and 50 until we get to item 1157, right?

24   A     Yes, sir.

25   Q     And that's over a period of what, three or four minutes?
```

```
 1   A    Roughly three minutes.

 2   Q    Okay.  And then, so 11 -- what was that last one?  1157

 3   at 5:30 -- 1156 is three minutes later and you're back up to

 4   2500 meters, right?

 5   A    That's 12:33:39.  So there's actually a three-minute gap.

 6   Q    Okay.  And then we just go -- then we have three

 7   2500 meters in a row until we get to the big one at 609, and

 8   you're at 10,000 meters at that point, right?

 9   A    Yes, sir.

10   Q    So I guess you're relying on what would be items 1162

11   through 1156?

12   A    1165 through 1157.

13   Q    Okay.  Well, you throw in there location accuracy

14   unknown, so I'm tossing that.

15   A    I've tossed that one.

16   Q    Okay.  I think I get it.

17            And so just to help me, if you can do this, going,

18   then, to page 15 of your CAST report and the box at the

19   bottom, 9/27/16.

20   A    Yes, sir.

21   Q    1:54 -- I'll start at the beginning.  1:54:23 a.m. is

22   50 meters, 11:55:10 a.m. 25 meters, 11:55:13 a.m. 25 meters.

23   Where -- can you point me to our data points?

24   A    Yes, sir.  Just give me a second and I'll find them.

25   Q    I appreciate it.
```

```
1   A    Yes, sir.  If you go to page 30.

2   Q    Page 30.  What item?

3   A    I'm getting that right now, sir.  1133.

4   Q    1133.  Let me go back and make a note for myself.

5             MR. HENDRIX:  Okay.  Can we go to that, Ms. JoJo?

6             MS. FOWLER:  I'm sorry, the computer has frozen.  I

7   need to close out and reopen it.

8             MR. HENDRIX:  No worries.

9   BY MR. HENDRIX:

10  Q    I don't have my eyes on it right now, but just tell me

11  what data points you're relying on.

12  A    Okay.  So line 1133 converted 1:54:23 a.m., and there's

13  two of those again, 50 meters.  Then a -- at 1:54:24 an

14  accuracy unknown.  And then 1:55:10, 25 meters; 1:55:13, there

15  are two of 25 meters.

16  Q    What's the time period?

17  A    Less then a minute.

18  Q    Got it.  And then branching out from there.

19  A    You have one at 50 at 1:56:19, and then the one before

20  that is at 1:53:40.  So roughly 20 -- excuse me, 43 seconds

21  and then six seconds after.

22  Q    Okay.  Page 17 of your report?

23  A    Yes.

24  Q    And that's got 9/27/2016, and essentially between

25  3:45:14 a.m. to --
```

```
1    A    It's 3:48.  It is a 4.  I looked at that.  I typod.

2    It's -- the last one is 3:48.

3    Q    I've got you.

4    A    That was -- I'll correct that before . . .

5    Q    No worries.  I didn't even realize I just did it.

6         So, anyway, between 3:45:14 a.m. and 3:48:54 a.m.,

7    your conclusion is 25 meters, and can you give me again the

8    page and item number in the NELOS records?

9    A    Yes, sir.  That is the same page, 30, line 1117.

10   Q    And then branching out.

11        MR. HENDRIX:  And I -- have we introduced this NELOS

12   record for the purpose of this?

13        THE COURT:  It hasn't been offered.  I assume that

14   the government would and that you would not object and that

15   I'd receive it.

16        MS. GARDNER:  That's fine, Your Honor.

17        THE COURT:  Received.  Hearing exhibit 1 received.

18   I'm wondering if it needs to be under seal given the

19   proprietary -- the AT&T proprietary --

20        MS. GARDNER:  No, Your Honor.

21        THE COURT:  No?

22        THE WITNESS:  No, Your Honor.  They're business

23   records.

24        THE COURT:  Okay.

25   BY MR. HENDRIX:
```

```
1   Q    And then I think the final one is on page 19 of your

2   report?

3   A    Oh, well, yes.

4   Q    Yeah.

5   A    I'm sorry, I misunderstood your question.

6   Q    Oh, no worries.  So that's got the 9/27/2016 4:18:24 a.m.

7   to 5:28:32 a.m., 25 to 50 meters.  And, again, can you give me

8   page number and --

9   A    And then there's other ones, 3:49 to 3:51 of 600 meters,

10  and that's, you know, longer timeframe, but that starts at

11  line 1112.

12  Q    1112.

13  A    And runs to -- we're going to page 29 now, to line 1076.

14  Q    And, I'm sorry, Agent, that's the 600-meter conclusion

15  that's up here in the top left?

16  A    They're -- basically what happens is we start getting

17  600-meter conclusions, and then they narrow down to 25 to 50.

18  Q    Okay.  So explain that to me.  We got all the little

19  circles here, right?

20  A    Yes, sir.

21  Q    That appear to encompasses Don Smith's house, the murder

22  scene and the burial scene at Porter's, right?

23  A    I don't believe the burial scene was at the -- I --

24  Q    The yellow Porter, yeah.

25  A    I don't think that was the -- I don't remember if that
```

1    was the burial scene or not.

2    Q    No worries.

3    A    It encompasses -- the Porter is out of it, but, yes, it

4    encompasses those circles as they move.  That device is moving

5    northeast.

6    Q    Oh.

7    A    It's flowing northeast on those points.

8    Q    I got you.

9    A    And then it settles closer.  We start getting more --

10   better levels of uncertainties when it gets near his

11   residence.

12   Q    And then your box again to the lower right that is

13   4:11:24 a.m. to 5:28:32 a.m.

14   A    Yes, sir.

15   Q    Twenty-five to 50 meters.

16         And that one appear -- are you concluding that he's

17   literally sitting in his house at that point?

18   A    Those show that it's consistent with the device being at

19   the house.

20   Q    And I guess what I'm getting at on this particular page

21   of the report, all those little circles, is the conclusion

22   that that's all as equally consistent as being at his house as

23   opposed to being at the murder are murder scene?

24   A    No, that's consistent with the device leaving the murder

25   scene and traveling towards the house.

```
 1    Q    I'm with you.
 2               Now, in each of those boxes and conclusions that we
 3    just went through on your CAST report, that data is explicitly
 4    the NELOS data, yeah?
 5    A    In this timeframe, yeah, there's only two calls in
 6    that -- there's only two call in that timeframe, yes.  So I
 7    do -- this one there is not as much supporting CDR data for
 8    these points.
 9    Q    Well, and I understand that we're talking about there's
10    an attempt here to corroborate through the CDRs, but in each
11    of those blue boxes that you've put in your report, it's just
12    the NELOS data.
13    A    In those particular blue boxes and then the other ones
14    with the blue border, that is the supporting call detail
15    records, yes, sir.
16    Q    Yeah, but you're -- if you're going to get on the witness
17    stand and go, Bill Smith was in 25 meters of the murder scene
18    at whatever, and I go, that's exactly what this NELOS record
19    says, right?  You're going to go, yeah, this is exactly what
20    it says.
21    A    Yes, sir, with the caveat that I can't a hundred percent
22    say that it was that device, even with all the supporting
23    documents, but my best conclusion is, yes, that is that
24    device.  I can't say with a hundred percent that it's that
25    device, but based on preponderance of the data I have, that it
```

1    is the right device.

2    Q    Yeah, I think you and I are on the same page.  I'm just

3    asking you, haven't you just essentially cut and paste the

4    NELOS record and inputted it into your CAST report to draw the

5    conclusion of a precise location?

6    A    No, sir.  I've taken the data and expressed it what the

7    data shows me.

8    Q    Yeah, but the NELOS record is exactly what your CAST

9    report says.

10   A    I guess I don't understand your question, sir.  I'm

11   showing the data that I have.  I don't -- I guess I don't

12   understand your question.

13   Q    It appears to me that there is no interpretation that

14   you're going through.  You're just taking the information from

15   the NELOS record that says at 12:24 a.m. he's within 50 meters

16   of this location, and you're just using that in your report.

17   A    No, sir, I'm corroborating it with these call detail

18   records, and I'm corroborating it to give the best location

19   for that device that I can.  That's all I'm here to do.  I'm

20   not here to prove or disprove anything.

21   Q    Uh-huh.

22   A    I am here to show what the call detail records and the

23   NELOS records show.

24   Q    Are there times in attempts in your analysis that you

25   couldn't corroborate?  Did you go through that exercise?

```
 1   A    Yes, sir.  And there's -- this is where I don't have as
 2   much cooperation.
 3   Q    Uh-huh.
 4   A    I would state that.  On this slide I don't have as much
 5   cooperation, but for all the earlier ones I have calls and
 6   texts almost at the exact same times occurring during those
 7   NELOS events.
 8   Q    Okay.
 9           THE COURT:  Mr. Hendrix.
10           MR. HENDRIX:  Yes, sir.
11           THE COURT:  Would this be an okay time?
12           MR. HENDRIX:  I think I've just got one question,
13   and then if you don't mind, if I talk to Lance.
14           THE COURT:  Good.
15   BY MR. HENDRIX:
16   Q    The scientific method you're aware of.
17   A    Yes.
18   Q    It's, here's the hypothesis, and then you try to prove it
19   wrong, right?
20   A    Yes, sir.
21   Q    That's the scientific method.  And if you can't prove it
22   wrong, you've proved the hypothesis, right?
23   A    Basically, yes, sir.
24   Q    So in each of these conclusions, did you attempt to prove
25   your conclusions wrong?
```

```
 1   A     Yes, sir.

 2   Q     How?

 3   A     By taking the data -- if I have -- I show on one of the

 4   slides where I have two outliers.  I'm not excluding data.

 5   The only data I excluded was when I have a large level of

 6   uncertainty centered on a cell tower which does nothing to

 7   narrow down my coverage area.  So it would just -- some of

 8   those circles would cover the entire screen, so it really is

 9   not helpful.

10   Q    Right, right, right.

11   A     So that's the only thing I excluded.  So, yes, I did do

12   that, because if there was data, I showed two data points that

13   they're obviously outliers.  I'm not trying to hide that.

14   Q    Yeah.  No, I get it.

15              MR. HENDRIX:  Okay.  Judge, I think that's all I've

16   got for right now.

17              THE COURT:  Very good.

18              Mr. Hendrix, how long would you request to confer?

19              MR. HENDRIX:  Do you want to do our morning break?

20              THE COURT:  Yes.  Let's come back around

21   11:00 o'clock, little after.

22              MR. HENDRIX:  Yes, sir.

23              THE COURT:  Good.  We're in recess.

24        (A recess was taken from 10:42 a.m. to 11:01 a.m.)

25              THE COURT:  Y'all can be seated.
```

```
 1              Mr. Hendrix.
 2              MR. HENDRIX:  Thank you, Judge.
 3  BY MR. HENDRIX:
 4  Q    Let's go back to cell tower information, and if I'm
 5  understanding, Agent, the cell tower data from the CDRs is
 6  useful to you as corroborating evidence to draw those
 7  conclusions about specific locations at specific times; am I
 8  right?
 9  A    Well, what I can say, sir, off of cell tower information
10  CR is that the phone utilized a tower and sector that has a
11  coverage area that includes a certain location.
12  Q    Okay.  That's useful to your analysis and your
13  conclusions, right?
14  A    That is what my analysis and conclusions are 90 percent
15  of the time.
16  Q    Got it.
17  A    Because most of my cases all I have is CDR data.
18  Q    You don't have the NELOS data?
19  A    No, sir.
20  Q    Got it.
21              Okay.
22              THE COURT:  Pardon me, Mr. Hendrix.
23              Okay.  Good.  Something's going on with the monitor,
24  and what's coming up and going down.  I don't know who's
25  working on it, but it's distracting.
```

1          MR. HENDRIX:  Understood.

2          THE COURT:  But we seem to be fixed now on a map.

3          MR. HENDRIX:  Pretty good.

4   BY MR. HENDRIX:

5   Q    Okay.  Cell tower data, CDR data relative to cell towers,

6   there is imprecision in drawing conclusions from that dataset;

7   am I right?

8   A    It's not imprecision, sir.  I can just only -- I can only

9   say the phone used a tower and sector, I can't narrow down

10  within that tower and sector based on call detail records

11  alone.

12  Q    And so let's work from this angle.  Using that type of

13  information, the cell towers, let's establish some basic

14  principles, we know that a phone does not necessarily connect

15  to the closest tower to it, right?

16  A    No, sir, a phone would select a tower that has the

17  strongest signal with the least amount of interference,

18  generally the closest tower.  But line of sight, stuff like

19  that plays into it.

20  Q    Sure.  It's going to connect to the tower with the

21  strongest signal at that moment, right?

22  A    At that moment in time what the phone saw as the

23  strongest signal.

24  Q    And so in drawing your conclusions that a phone is

25  connecting to any of these towers in Malvern, your conclusion

1   is that it must be the closest tower, right?

2   A    No, sir.  As I stated, it's the tower with the strongest

3   signal.

4   Q    Yeah.  It -- so could it be different towers, though?  He

5   could -- sorry for interrupting, and maybe the best way to say

6   it is this:  Don Smith's cellphone, your anticipated testimony

7   is, it connected to number X tower, right?

8   A    Yes, sir.

9   Q    It -- and from that, you're using that as a basis to draw

10  a conclusion that the cellphone was closest to that tower --

11  was in the range of that tower?

12  A    It was not the close -- I can never say that.  It was

13  using the tower it saw the best at that time, so that phone

14  was in the coverage area of that tower at that time, that

15  tower and sector.

16  Q    Yeah, but couldn't it be that the phone is physically

17  closest to -- closer to, let's say, a tower in the northeast

18  part of town, but it's picking up on the network from the

19  tower that's in the southwest part of town because it happens

20  at that moment in time to have the strongest signal?

21  A    Yes, sir.  As I've stated several times, it's choosing

22  the tower it sees the strongest at that moment in time.

23  There's a built-in overlap in the network where, because it's

24  a mobile phone, they don't want hard lines where you only have

25  coverage from one tower.

```
 1              There's an overlap of the network.  Towers overlap,
 2   sectors overlap.  So if you're near an overlap of a tower, you
 3   can jump sectors just because you walk five feet.
 4              THE COURT:  I didn't think there was a fuss,
 5   Mr. Hendrix, about the cell tower data.
 6              MR. HENDRIX:  I think where I'm going with this is
 7   he's using it as part of his methodology, and the question
 8   then becomes the reliability of that foundational evidence,
 9   and this is what's covered in the -- in our motion that I can
10   work through real quick about the variabilities on cell tower
11   data.  But does that make sense where I'm going with it?
12              THE COURT:  It does, but I -- I think I got that
13   from your papers.
14              MR. HENDRIX:  Understood.
15              THE COURT:  Thank you.
16              MR. HENDRIX:  My pleasure.
17   BY MR. HENDRIX:
18   Q    What are cell site surveys?
19   A    In what context, sir?  I mean, that can mean several
20   different things, so I'm asking what context.
21   Q    I don't know.  What do you know about cell site surveys?
22   A    It's a generic term for -- that could be someone taking
23   an engineering phone at one point and going, that's the tower
24   I see best, that's my cell site survey.  It can be a drive
25   test.  It can be just basic historical call detail record
```

1   analysis.  There's -- it can't be a, let's see broad -- it's

2   my understanding that's a pretty broad term for that.

3   Q    Well, tell me if my understanding is correct.  So the

4   carrier, AT&T in this case, they do surveys of cell tower

5   ranges, right?

6   A    Yes, sir, they'll do limited drive testing, they'll use

7   the NELOS system, other databases.  Yes, they will do surveys,

8   and lot of time that's, you know, they'll get an issue where,

9   we're getting a bunch of complaints for dropped calls, why?

10  Oh, someone put an apartment building up, we need to adjust

11  our network to compensate for that.  That's something the

12  engineers do all the time.  That's what their job is.

13  Q    Okay.  And I think I got it.  So periodically AT&T will

14  go out to a cell tower and do sort of a physical analysis of

15  it and then go, here is, with some precision, the actual range

16  of that cell tower, right?

17  A    Sometimes.  They tend to more rely on propagation and

18  theoretical.  They don't go out as often as -- they go out,

19  but I have no idea how often they go out, or anything like

20  that.

21  Q    Okay.  But the surveys, the point of them is to be able

22  to come up with a fairly accurate range for a specific cell

23  tower, right?

24  A    The approximate range, yes, sir.

25  Q    Yeah.  Now, did you get -- and those surveys are

```
 1   published?
 2   A    Sometimes.  But, no, sir, we don't get those surveys
 3   because I have to -- for it to be accurate, it has to be very
 4   close in time to when these events occurred.  That's why when
 5   we do a drive test, we try to do it as close as possible to
 6   the timeframe.
 7   Q    Uh-huh.
 8   A    So I don't know if there are any surveys that exist
 9   during that time.  That's not something we do as our normal
10   course of business.
11   Q    And that was what I was going to ask.  Did you try to go
12   back to September 2016 to see -- well, let me say that again.
13            Did you try to find any surveys from around
14   September 2016 of the four cell towers at play here?
15   A    No, sir.
16   Q    Okay.  You just didn't go look for them?
17   A    That's not our -- we don't do that.
18   Q    Okay.  So you didn't have the benefit of a cell site
19   surveys in drawing conclusions?
20   A    No, sir.  I can base it off of my training and experience
21   from the engineers --
22   Q    Okay.
23   A    -- that when I say this is the approximate coverage area,
24   it's the approximate coverage area of that tower.
25   Q    Everybody in the room may have understood TMSI, but I'm
```

1   lost.

2   A     TMSI -- IMSI is an international mobile subscriber

3   identifier.  It's usually embedded on the SIM card of a phone,

4   but that's one way the network or the phone company identifies

5   a phone besides its phone number.  The IMSI is never broadcast

6   by the phone across the network.  They get assigned TMSIs, a

7   temporary IMSI.

8   Q     Okay.  I think I'm tracking.

9   A     And that's the issue with the NELOS is sometimes that it

10  can pick up -- that TMSI can get allocated to another phone

11  40 miles away, and then it comes back, and then they catch the

12  wrong device for a split second, and then they get back and

13  go, okay, now I'm back on the right device.  That is a issue

14  with the NELOS.

15  Q     Got it.  And that's what you're saying is, realizing

16  there are these outlier events when a phone -- pardon me, when

17  a NELOS record may actually pick up another phone's data?

18  A     Yes, sir.

19  Q     Okay.  And you're saying, to draw my conclusions I've

20  aware of that so I exclude it?

21  A     No, sir.  In this case I show on -- I can't remember

22  which slide it is, there's earlier in the evening between the

23  9:30 rough and midnight timeframe, most of the NELOS is

24  centered around his residence, and there are two outliers,

25  maybe about half a mile, rough, away, where, based on the

1    NELOS there's no way that phone could travel that distance and

2    back.  So I show two outliers.

3    Q    Yeah.  And so we're talking about there are -- pardon me.

4    There are anomaly -- there are anomalies in the NELOS data?

5    A    I show two anomalies during this timeframe besides the

6    center on the tower with a large level of uncertainties.

7    Which, those are not anomalies.

8    Q    In your conclusion regarding the anomalous results is

9    because the phone was connecting to a different tower, so

10   therefore it must be a different device?

11   A    In this case they're within the coverage area of that

12   sector, but in the aggregate, they don't fit the aggregate of

13   the amount -- because that I have a lot of data points over a

14   three-hour timeframe.

15   Q    And that's what I'm trying to nail down is when you're

16   excluding these outliers, those anomalies, you're excluding

17   them and concluding it's somebody else's device that got

18   picked up because that device you can tell is in a different

19   cell tower sector?

20   A    That's usually what occurs.  In this case they're still

21   within the coverage area of the towers that were being used,

22   because it's not a huge jump.  It's a jump, it's a far enough

23   jump that the phone could not do it, but when the aggregate,

24   those are probably the outliers.

25   Q    Because they're outside, in your conclusion, of the

```
1   coverage of that cell tower?
2   A    No, sir.  Based on the other -- the aggregate of the
3   NELOS.  In this case, those outliers happen to fall in the
4   coverage area of that tower.  They're still within the
5   coverage area.  They're on the outskirts of that tower, I
6   believe, but they're still within that rough area where I
7   can't say a hundred percent.
8            But based on the aggregate in that timeframe with
9   the data I have, that's probably not the device, because I
10  have 26, 24 in one location, and two outliers.
11  Q    Make sure I understand.  Two phones can be within the
12  same cell tower radius?
13  A    There could be hundreds of phones within the same cell
14  tower radius, sir.
15  Q    And NELOS could pick up another phone that's within the
16  range of that tower, yes?
17  A    Yes, sir.
18  Q    But NELOS would be -- it could be somebody else's phone
19  within that tower, right, within that tower range?
20  A    Yes, sir.  But when I can rely on that NELOS point up
21  with a particular phonecall and/or text, that gives me more
22  reliability.  I'm locating to a specific event, that NELOS
23  event, I'm tying it to a very specific event on the CDR.  I'm
24  not -- you know, there's a text at the same time as that NELOS
25  event.  There's a call occurring during that NELOS event.
```

```
 1   Q    Okay.  I think I got it, but tell me if I'm right.

 2             In drawing your -- well, not drawing your

 3   conclusion.  NELOS can appear to say Don Smith's phone's

 4   within 25 meters of this place at this time, but we know that

 5   NELOS could be picking up somebody else's cellphone within the

 6   range of that tower?

 7   A    It could be -- it could just be picking up a -- yes, it

 8   could have gotten a TMSI switch.

 9   Q    Got it.

10             Okay.  You're familiar with the cell hawk program?

11   A    I know it exists.  I've never played with it.

12   Q    You want to?

13   A    No.

14   Q    We're gonna.

15   A    To be honest, sir, my analysis is my analysis.  Your

16   expert's analysis is your expert's analysis.  There's no

17   reason to -- his analysis, if he wants to talk about his, he

18   can come up on the stand and talk about that.  I'm not going

19   to talk about another program that's someone else's analysis.

20   Q    I bet you do, because my cross-examination is going to

21   include some graphics.

22             MS. GARDNER:  Well, I'm going to object to this,

23   Your Honor.  This is not why we're here today.  We're not here

24   for the defense's analysis of the data in this particular

25   case.  We are here to discuss whether or not the underlying
```

1    NELOS data is -- does meet the Daubert standard, which is a

2    preponderance of the evidence of reliability.  And he has had

3    no prior notice that he's going to be asked to interpret

4    somebody else's data on a different program, and that's what

5    he's saying, that's not what he's here to do.  And we agree

6    with that, Your Honor.

7              THE COURT:  Thank you, Ms. Gardner.

8              Mr. Hendrix, I think your sister Gardner is right

9    about the focus of the hearing.  I might allow a question or

10   two about some alternative program or method of doing this

11   location stuff, but not very far.

12             And here's another problem, counsel, just a

13   practical one.  We started late this morning on the

14   representation to me that this was going to be a short

15   hearing, an hour or so.  And so I have other obligations in

16   the day.  I have an obligation at noon, I have an obligation

17   at 1:30, and I had hoped to -- that within an hour, an hour

18   and a half, we would conclude this and I would be able to

19   rule, and it's growing doubtful, and that concerns me.

20             MR. HENDRIX:  I will -- can I have just a second to

21   see if I can speed things up?

22             THE COURT:  Sure.

23             MR. HENDRIX:  Then that will conclude this, and I'll

24   go with Mr. Sloves.  That would conclude my cross-examination

25   of Agent Sedwick.

1          MS. GARDNER:  For the record, Your Honor, we were

2    provided no notice, no background on this witness, no report

3    from this witness.  We received nothing from defense on this

4    today, and we hadn't anticipated they were going to call an

5    expert of their own.

6          THE COURT:  I hadn't anticipated it either,

7    Mr. Hendrix.

8          MR. HENDRIX:  It's going to go to -- here's what I

9    was expecting to do.

10          So Mr. Sloves used a program called Cell Hawk.

11    That's a known program in here, and he inputs data, doing it

12    probably right now can input data, and then it spits out a

13    visual.  And so what I was hoping to do was put that visual on

14    so the Court can actually see how NELOS expands and contracts

15    and expands and contracts dramatically and momentarily.

16          MS. GARDNER:  Well, I think we've covered that, Your

17    Honor, because you have the NELOS data in front of you.  You

18    know it goes from 50 to 2500 to 10,000.  We've had testimony

19    about how it jumps, why it jumps, why it's used in the

20    aggregate.  I don't think we need a visual on that, Your

21    Honor.

22          MR. HENDRIX:  It's a question for the Court, is it

23    going to help you, or do you feel like you've got enough

24    information?

25          THE COURT:  I feel like I have -- I'm close to

1    enough information, and what I need is the arguments of

2    counsel in terms of Daubert.

3         I do have one question that I'd like to ask our

4    agent, but I don't want to interrupt your flow.

5         MR. HENDRIX:  No.

6         THE COURT:  Any more than I already have.  I'm

7    sorry.

8         MR. HENDRIX:  No, sir.  I'm at the point I just want

9    to get this information to the Court so it's satisfied it's

10   got enough information in order to rule.

11        THE COURT:  I think counsel have done their job on

12   that.

13        MR. HENDRIX:  Good.

14        THE COURT:  Okay.  Ms. Gardner, may I interrupt here

15   and just ask my question?

16        MS. GARDNER:  Absolutely, Your Honor.

17        THE COURT:  Agent, I was not clear from your maps

18   about the two homes that we're talking about, the Porter

19   residence and the Don Smith residence on how far they are

20   apart.

21        THE WITNESS:  I can measure that right now, sir.

22        THE COURT:  Good.  In other words, and this is not a

23   criticism, but I wasn't sure the scale here on your map.

24        THE WITNESS:  It depends.  The map's scale, because

25   as I zoom in and out, the scale changes.  There is a scale at

```
 1    the bottom of the map.
 2              THE COURT:  Ah, okay.
 3              THE WITNESS:  I'm just trying to find the best map
 4    to use.
 5              About a thousand to 1200 meters as the crow flies.
 6    So 1.6 kilometers is a mile.  So three quarters of a mile-ish.
 7              THE COURT:  Uh-huh.  Thank you.
 8              THE WITNESS:  Yes, Your Honor.
 9              THE COURT:  Mr. Hendrix, last chance.  Anything else
10    you want to clarify?
11              MR. HENDRIX:  No, Your Honor.  No, sir.
12              THE COURT:  Okay.  Ms. Gardner, redirect.
13              MS. GARDNER:  Just one question, I think.
14                        Redirect Examination
15    BY MS. GARDNER:
16    Q    Mr. Sedwick, in doing your analysis in this particular
17    case, did you take the NELOS data, did you corroborate it with
18    whatever other information you had, everything else that you
19    had?
20    A    Yes, ma'am.
21    Q    Okay.  That included phone calls being made at the time?
22    A    Yes, ma'am.
23    Q    That included the cell tower data where you know it was
24    in the sector?
25    A    Yes, ma'am.
```

```
 1   Q    And under that, you only used the points that were useful
 2   in paring down where that phone was within that sector?
 3   A    Yes, ma'am.
 4   Q    Did you submit your analysis for peer review?
 5   A    Yes, ma'am, I did.
 6   Q    The people who work in the CAST in the headquarters
 7   are -- I hate to categorize it, but are they geeky as to what
 8   they do?
 9   A    Some are, yes.
10   Q    They analyze data; is that correct?
11   A    Yes, ma'am.
12   Q    Did any of those people have a dog in this fight about
13   this case?
14   A    No, ma'am.
15   Q    Did they sit and analyze your data?
16   A    Yes, ma'am.
17   Q    What was their conclusion about -- their peer review
18   conclusion about your data?
19   A    That it was accurate and that it was useable in this
20   case.
21   Q    Did they also have any opinion about the breadth or the
22   volume of accurate NELOS data in this case?
23   A    Not any specifics, no, ma'am.  Just that we -- they were
24   impressed that we actually had very accurate NELOS data.
25   Q    Okay.  So they were actually impressed by your work in
```

```
 1   this case?

 2   A    Yes, ma'am.

 3   Q    It was somewhat of an unusual case as far as the accuracy

 4   that could be predicted; is that correct?

 5   A    Yes, ma'am.  Usually we don't -- the NELOS of 25 to

 6   50 meters, that many, that close together, I don't see that

 7   very often, unless I'm in like a downtown area.

 8   Q    Okay.  But you did see it here?

 9   A    Yes, ma'am.

10   Q    Which is why you drew your conclusions, and you are

11   approved to testify about it?

12   A    Yes, ma'am.

13   Q    Okay.  Do you have any question about the cell tower

14   coverage of those three towers that we're seeing in this case

15   that the NELOS data was within the cell tower coverage of

16   those three towers?

17   A    No question at all, ma'am.

18   Q    Do you even feel like you needed to do a drive test to

19   figure that out?

20   A    No, ma'am.

21              MS. GARDNER:  Thank you.

22              THE COURT:  Thanks, Ms. Gardner.

23              Mr. Hendrix?

24              MR. HENDRIX:  Very brief.

25              THE COURT:  Sure.
```

```
 1                       Recross-Examination
 2   BY MR. HENDRIX:
 3   Q    When you're talking about your conclusions and report was
 4   subject to peer review, who are those peers?
 5   A    Other CAST agents.
 6   Q    Law enforcement agents?
 7   A    Yes, sir.
 8   Q    You didn't send your report out to engineers at AT&T for
 9   their review?
10   A    No, sir.
11   Q    Anybody else in the field never reviewed your report or
12   peer reviewed it for accuracy?
13   A    No, sir, but --
14   Q    Only law -- sorry.  No, no, no, I'm interrupting and
15   about to drive Stephen and the Judge insane.
16   A    But we are recognized experts in this by AT&T.  If an
17   outside agency comes to AT&T and asks them to do a historical
18   call detail record analysis, a local department, they refer
19   them to us, to the CAST unit.
20   Q    Yeah, I got it.
21        The point is is that the peer review was by fellow
22   law enforcement officers in your Dallas office, right?
23   A    No, sir, it was another CAST agent.  I'm the only CAST
24   agent in Dallas.
25   Q    Oh, there's another CAST agent with the FBI in another
```

```
 1   area of the country?

 2   A    Yes, sir.

 3   Q    So it was peer reviewed by one peer?

 4   A    Yes, sir.

 5   Q    Got it.  Was there a peer review report?

 6   A    Just some notes.  Generally it's just notes on typos and

 7   stuff like that.

 8   Q    Okay.

 9   A    It's, you know, informal.  It's a formal peer review

10   process, but notes are informal.

11   Q    I understand.

12   A    If that makes sense.

13   Q    Yeah, thanks.

14        THE COURT:  I understood that the peer review is to

15   be by what I took to be somebody at DOJ, at the mother ship.

16        THE WITNESS:  Well, in this case, sir, I cleared my

17   testimony through the FBI CAST unit at headquarters, but the

18   peer review is done by another agent in the field after I got

19   that approval.  Then he goes back and redoes my work in a

20   different mapping software to make sure there aren't any

21   errors in the software and typos and stuff like that, Your

22   Honor.

23        THE COURT:  Got it.  So it truly is a peer of yours?

24        THE WITNESS:  Yes, sir.

25        THE COURT:  Another agent in the field?
```

1           THE WITNESS:  Yes, sir.

2           THE COURT:  Okay.  Did my question prompt any

3    further questions, Ms. Gardner?

4                      Redirect Examination

5    BY MS. GARDNER:

6    Q    But ultimately, have you -- let me ask you, have you done

7    a peer review for another agent?

8    A    Yes, ma'am, I've done several.

9    Q    Okay.  And when you do those, do you start completely

10   from scratch?

11   A    Yes, ma'am.  I take the records, I take their report so I

12   know the timeframe I'm looking at, basic stuff, the basic case

13   information.  I use a different mapping software in case the

14   error is in the mapping software, and I redo their case

15   independently.

16   Q    Okay.  And if there are errors in the analysis in their

17   case, then that is brought to their attention, correct?

18   A    Yes, ma'am.  And then we'll figure out where the --

19   who -- you know, whose error it was.  And in that case there's

20   some times where we'll reach out to the cellphone company

21   itself to get confirmation on something if there's an issue.

22           But generally it is that peer review process to make

23   sure it is as accurate as humanly possible before it goes into

24   court.

25   Q    And as a CAST agent, rather than, say, an investigative

```
 1   Agent in a particular case --
 2   A    Yes, ma'am.
 3   Q    -- your position is to crunch numbers, is it not?
 4   A    I do the cell analysis.  I have no other role in these --
 5   in a case like this.  Now, a kidnapping live investigation
 6   I'm, you know, knee deep in it, more involved.  But in a truly
 7   historical case like this, yes, I am just doing the call
 8   detail record analysis.
 9   Q    Okay.  And that is specifically from data that you get?
10   A    Yes, ma'am.
11        MS. GARDNER:  Okay.
12        THE COURT:  Mr. Hendrix?
13        MR. HENDRIX:  No, sir.  Thanks, Judge.
14        THE COURT:  Thank you.
15        Agent Sedwick, thank you for making the special
16   trip, I understand, to come and testify.  It's helped me.  You
17   can stand down.
18        THE WITNESS:  Thank you, Your Honor.
19        THE COURT:  You're welcome.
20        THE WITNESS:  I don't know whose copy of this is.
21        THE COURT:  Ms. Gardner, may I have that copy, too,
22   so that it can become the Court's copy of hearing exhibit 1?
23        MS. GARDNER:  Sure.  You have the same.
24        THE COURT:  I'd like one to mark on and to be mine
25   and one to give to Ms. Black or she'll get on to me.
```

```
 1              I know that our experts are traveling and have other
 2    obligations.  Why don't we take five minutes, and they can be
 3    excused if they need to get back on the road, and then we'll
 4    come back and have argument.
 5              MR. HENDRIX:  Yes, sir.
 6              THE COURT:  Very good.
 7         (A recess was taken from 11:27 a.m. to 11:33 a.m.)
 8              THE COURT:  Thank you.  Y'all can be seated.
 9              Mr. Hendrix, I think the procedural posture is the
10    motion is Mr. Smith's, and so I need to hear I think from you
11    and Ms. Depper -- or Ms. Depper first, and then, Ms. Gardner,
12    if you'd respond.
13              And I take that back.  After I hear from
14    Mr. Hendrix, Mr. Morledge, if you wish to be heard at all,
15    you'll have a chance.
16              MR. MORLEDGE:  Thank you, Your Honor.
17              THE COURT:  Sure.
18              MR. HENDRIX:  And so here are, I think, the
19    highlights.  The 702 analysis, the wrongs that we're dealing
20    with are:  Is the testimony based on sufficient facts and
21    data, which I think is central to this thing, how reliable is
22    the data, was the methodology reliable.
23              And so here's what I've been hearing is, first and
24    foremost, to beat that dead horse, AT&T itself acknowledges
25    that its algorithm is imprecise and shouldn't even be used for
```

investigative reasons, much less in a criminal court.  So the
reliability of that data is, I think, most subject to
question.

One of the interesting things is it was -- it picks
up other phones, and those phones can be within the range of
that same cell tower.

There is no training on this subject matter, and the
agent can't say, I've been trained.  There's not a textbook,
there are no standards or norms for this type of analysis in
what I would think is a field of scientific specialized
knowledge that in other fields of specialized knowledge there
are specific norms, and here are the criteria and how to test
and draw conclusions.

This is just one man's hypothesis and making up a
methodology on his own.  That methodology is subject to
reliability questions for several reasons, it seems to me.

One, the sampling rate is so small.  And then we do
this.  You try to come to a conclusion of, I'll reach a
conclusion based on three data points within three minutes.
But, again, there is no industry standard that we've heard
about the foundation on which one has to use to come up with a
reliable conclusion.

It's unclear exactly where -- well, I just said
that.  It's not clear to us exactly where the data comes from.
It could come from other phones.  The peer review obviously, I

1    think that you and I have the -- we know what peer review is,

2    and that's why I had to ask the question, and it was a peer

3    review of one, right?  And it didn't go out to other people in

4    the field, which is I think the common notion of peer review.

5            And that's it.  I hate to ask do you have any

6    questions, because I may stumble over them, but I think Your

7    Honor understands where I'm coming from.

8            THE COURT:  I do understand, and I don't think I

9    have any questions.  Thank you, Mr. Hendrix.

10           MR. HENDRIX:  Thank you, Judge.

11           THE COURT:  I'm sorry.  I forgot, yes, Mr. Morledge,

12   did you . . .

13           MR. MORLEDGE:  Honestly, Your Honor, I forgot to say

14   anything.  No, I have nothing to add to that, Judge.

15           THE COURT:  Wait a minute, now.  Don't you need to

16   say "amen" to your Brother Hendrix?

17           MR. MORLEDGE:  Amen.  I give him my blessing, as

18   well.

19           THE COURT:  All right.  Ms. Gardner.

20           MS. GARDNER:  Your Honor, what the NELOS data does

21   in this case is it takes what we already have accepted as

22   evidence in this case, which is the cell tower data.  I don't

23   think there's any dispute on those slides that the cell tower

24   covering those phones is one of those three that we see.

25   There's no need to have a drive test in this particular case.

1  That cellphone for a number of hours is hitting off of one of
2  those three towers.  All that NELOS does is take where that
3  phone is within a sector and narrow it down.

4          Now, it narrows it down by pulling data from that
5  device and sending it through an algorithm, and that algorithm
6  accounts for how good the data is, what it can do with the
7  data, and sometimes it says, I can't do anything with this
8  data, I can't even tell you, or sometimes it says it's good
9  for 2500 meters, which means that's the best I can do.

10         But sometimes the algorithm says, I've got such good
11 data I can put it within 25 meters.  I cannot put it
12 100 percent at a location, but I can put it within 25 meters,
13 or I can put it within 50 meters of a lat./long. location.
14 And that's all that NELOS does.  All right?

15         And so to say that the data is imprecise or it
16 shouldn't be used for investigative purposes or whatever on
17 the AT&T disclaimer that they have -- and you know that they
18 have lots of lawyers working on the disclaimer, because
19 somebody would come along and say, you said that the data
20 point was right there, and we kicked in that door and it
21 wasn't the data point, and sue them.  Okay.  So there's a
22 disclaimer on that.  It says use with caution.

23         What the caution is here is that we don't take just
24 that NELOS point of 25 meters; we look at the call data.  This
25 particular phone in this case was making calls and making

texts at the exact same moment that the NELOS data said it was
at 25 meters, and that's why we can say with sufficient
certainty that it was that phone.

          And we also can say because it was in the cell tower
sector.  We can say with sufficient certainty it was that
phone.

          Now, can that NELOS data pick up another device?
Yes, it can.  And could it drag it in, and could it be there?
Sure.  But that's why we have the call data to say that phone
was making a call and hitting off of that tower at the exact
same time.

          And so to take everything in the aggregate, you have
to look at various different points, take them in the
aggregate so that you have a sufficient understanding of where
that phone was, that it wasn't an outlier, it didn't pull
something in.

          And Mr. Sedwick has put on his analysis times when
it could have been another device.  He put it on there.  It's
at 600 meters at this time, it's at 700 meters this time, and
he put those out there.  The jury can decide whether or not to
believe the accuracy of where that phone was based on the
aggregate data.

          And so the sampling is not too small.  Mr. Sedwick
said we don't really even get this many accurate points in
NELOS data.  This is an unusual case where we have so many

accurate points that we are confident in saying that phone was

in -- within 25 meters of that location.  If we didn't have

the corroborating data, we wouldn't even be here talking about

the NELOS data at all.  It just so happens that we had the

phone records and the cell tower data to be able to establish

the accuracy of that.

Again, preponderance of the evidence is not a

hundred percent.  We are never going to have anything in this

area that's a hundred percent.  The analysts agree with that,

AT&T agrees with that.  But you can have data that is reliable

to send to the jury for them to make a determination.

Now, he will be subject to cross-examination.  I'm

sure Mr. Hendrix will, you know, go into how reliable is your

data, and how did you do this, and doesn't it mean it could be

another device, and Mr. Sedwick will testify, yes, it could

be, but with the data we have in this particular case, it is

more probable than not under the preponderance that that phone

was within 25 meters at a particular time.

And the peer review, you can say that it was a peer

review of one, but when we get things from the crime lab, it's

a peer review of one.  It's sent to another scientist who runs

the tests or does the DNA analysis, who validates that the

scientist has done it correctly, and we rely on that all the

time, because it's somebody within the system who checks their

peer's work.

1                   Now, to say that, oh, it's a law enforcement agent,

2      it can't be trusted, can't be trusted, these people -- he

3      doesn't work on this case.  All he does is crunch numbers.

4      Certainly whoever he sent it to in the country didn't know

5      anything about the underlying facts of this case.  All they

6      did was crunch the numbers and put it through the programming

7      and make sure that it was accurate, and that's why it can be

8      trusted to be presented to the jury.

9                   And again, it's a very, very conservative,

10     conservative analysis of this data, because the FBI at

11     headquarters doesn't want people going out around the country

12     and testifying willy-nilly about NELOS data when it's not

13     certain.  This is the first time Mr. Sedwick has been able to

14     testify to this because it is so accurate in this case.

15                  THE COURT:  A question, Ms. Gardner.

16                  MS. GARDNER:  Yes.

17                  THE COURT:  It connects with your how the Department

18     of Justice or the FBI looks at this.  The only reported case I

19     think I've been able to find is this Indiana state court case.

20     There may have been one other.  Are there other authorities

21     that you know of?

22                  MS. GARDNER:  There was a case that was out of

23     Colorado, but it was a state case, and it was Penney,

24     P-e-n-n-e-y.  I have been fighting with the State of Colorado

25     to try to get an opinion on that case, because it was a lower

1    court decision.  They may have not published an opinion.

2              THE COURT:  Okay.

3              MS. GARDNER:  There is a case, interestingly,

4    there's a case, Nelson, which is a Northern District of

5    California case.  It is a district court case.  In that case,

6    the defense argued that the expert shouldn't be allowed to

7    testify to cell tower data because they didn't rely on the

8    more reliable NELOS data.

9              So defense across the country is using this as a

10   sword and as a shield, and they can't have it both ways.  It's

11   either reliable enough to present or not.  And so they can't

12   criticize people for not using NELOS because it is the more

13   reliable data.

14             THE COURT:  What did my colleague on the Northern

15   District of California do in the sword situation?

16             MS. GARDNER:  They found that the underlying report

17   from the expert on the cell tower data was admissible.

18             THE COURT:  Uh-huh.  All right.  Thank you.

19             Agent Sedwick, as I said, I appreciate you coming in

20   and testifying.  It helped the Court.

21             Counsel, I appreciate the work that you did before

22   we got in here today and today.  I found it very helpful.

23             It's common ground that the cellphone data is coming

24   in, and so you will be back, Agent Sedwick, no question about

25   that.  But the defendant's motion is granted as to the NELOS

```
 1   data.
 2          It's interesting to me that this -- this is an
 3   aside, but NELOS, NELOS, it's like Daubert, the test I'm
 4   supposed to apply here.  Lawyers disagree on whether that case
 5   name is pronounced Daubert or Daubert.  I think there has been
 6   a consensus around Daubert, but anyhow.
 7          Counsel know that the governing law is provided in
 8   Rule 702 of the rules of evidence and in the Supreme Court's
 9   decision in Daubert and the court of appeals decisions
10   interpreting it.
11          I understand why the government has come forward and
12   offered this proposed evidence, but I do not find that it to
13   be sufficiently reliable by a preponderance of the evidence to
14   go to the jury.
15          I note the one reported appellate case on point from
16   Indiana came out the other way.  That's the Browning case, 152
17   northeast third 1070.  It may be an unreported decision, so
18   I'm not sure of its precedential value.  But at any rate, the
19   Court went -- was at some pains to say that it was not bound
20   by the Daubert stricter requirements on reliability.
21          The Court has -- me, I have two difficulties with
22   the data.  Well, maybe three.  There is the AT&T disclaimer,
23   Mr. Hendrix.  To begin, there's the AT&T disclaimer.
24          Though, Ms. Gardner, I have to say I think you dealt
25   with that well, that they have good lawyers, and it doesn't
```

1    purport to be 100 percent accurate, and it's a caution light

2    at best.

3            What particularly concerns me, though, is this

4    mystery algorithm that our -- and the proprietary software.

5    We don't know, I don't know exactly what is in the algorithm,

6    and the agent gave some testimony at a general level about the

7    kind of information that goes in, but it seems to me that I'm

8    missing a -- an important foundational stone there of

9    something with more specificity as to the kinds of things that

10   the algorithm uses and how the algorithm does its work.

11           We know that there are disturbances from time to

12   time, or anomalies as was called, with the TMSI number.  I

13   also -- I acknowledge some uncertainty about TMSI numbers and

14   how many devices that might be connected with and how it is

15   that the algorithm might deal with that.  So there's that.

16           Then there is, in my view, almost a -- so we've got

17   our black box there, which is concerning, and I would say at

18   this point there's a peer review problem, as well, because I

19   don't have any scholarly literature or evaluation of the black

20   boxes or the kind of things that could go into this black box

21   and how it would work.

22           The United States points me to, and rightly so, our

23   corroborating data points of the calls and the texts, but

24   that, it seems to me, we fall almost into a circularity

25   problem, and by saying, well, the NELOS data is just a

1    refinement of the cellphone, the tower data.

2            I understand about the corroboration, but I still

3    find myself at sea of understanding how it is the -- how

4    things happen in the black box and whether -- whether what

5    comes out of the black box is sufficiently reliable that the

6    jury can rely on it.

7            In terms of Agent Sedwick's work, I agree that there

8    was review by a peer, and that's commendable.  It's analogous,

9    it seems to me, to what we do in the law office or in chambers

10   where another lawyer doublechecks citations and facts against

11   the record and makes sure there are no mistakes of fact and

12   that the reasoning hangs together in the draft of a brief or

13   an order; and all of that is commendable.

14           My view of Daubert, though, is that where possible,

15   the methodology ought to be subject to a broader audience of

16   peers that can look and poke and attempt to replicate and

17   question the kind of thing that we have seen, alas, in recent

18   days with the virus trials of the vaccines and the various

19   studies that are being done on effectiveness and waning

20   effectiveness over time, a more traditional effort by the

21   group of relevant folks with expertise here, engineer,

22   computer engineers, as I understand it, who would look at all

23   of these pieces.

24           So the Court welcomes Agent Sedwick's testimony and

25   a revised version of it, a limited version of it, perhaps a

1    revised version of the slides that is based on the

2    cellphone -- cell tower data, which I believe is sufficiently

3    reliable.

4            I will enter a short order saying for the reasons

5    stated on the record, that is the Court's ruling.

6            Ms. Gardner, I know you're on the losing end of

7    this.  Any request for clarification of my thinking?  I know

8    you disagree with it, and I'm not asking --

9            MS. GARDNER:  I highly disagree with it, Your Honor.

10           THE COURT:  I know.

11           MS. GARDNER:  It's a shame.

12           THE COURT:  Understood.

13           Mr. Hendrix, any request for clarification?

14           MR. HENDRIX:  No, sir.

15           THE COURT:  Okay.  Counsel, we will be in recess,

16   and I'll see you all at 8:15 on Monday morning.

17        (A recess was taken at 11:54 a.m.)

18                    *  *  *  *  *

19

20

21

22

23

24

25

```
1                            * * * * *

2                          I N D E X

3   Testimony of Mark Sedwick

4            Direct by Ms. Gardner              6

5            Cross by Mr. Hendrix              22

6            Redirect by Ms. Gardner          70

7            Recross by Mr. Hendrix           73

8            Redirect by Ms. Gardner          75

9                        * * * * *

10                       E X H I B I T S

11  (None.)

12                       * * * * *

13              CERTIFICATE OF REPORTER

14      I, Stephen W. Franklin, Registered Merit Reporter, and

15  Certified Realtime Reporter, certify that the foregoing is a

16  correct transcript, to the best of my ability, from the record

17  of proceedings in the above-entitled matter.

18      Dated this 13th day of SEPTEMBER, 2021.

19

20      /s/Stephen W. Franklin
        _____
21      Stephen W. Franklin, RMR, CRR

22

23

24

25
```

Stephen W. Franklin, RMR, CRR, CPE
United States Court Reporter
stephen_franklin@ared.uscourts.gov (501)604-5145